181279 Kimberly Theaton v. Harvard University, et al. Ms. Corey, good morning. Good morning. Good morning, and may it please the court, Lauren Corey on behalf of the appellant, Dr. Kimberly Theaton, who is here with us today in the courtroom. With the court's permission, I'll reserve five minutes of my time for rebuttal, please. You may. Thank you. When Dr. Theaton was first promoted to associate professor at Harvard University in 2008, the acting chair and the only woman tenured in her department at the time told her that in order to be successful at Harvard, she would need to behave like a dutiful daughter, meaning an employee who did not complain, and that when she came up for tenure, she would be held to a higher standard than the men in her department. When Harvard denied Dr. Theaton tenure in May of 2013, that is exactly what happened. The record here is replete with facts from which a jury could conclude that, one, Harvard held Theaton to a higher standard than the male candidates before and after her, two, explicit comments of gender bias and hostility to Theaton's protected activities show improper animus, and three, that escalating hostility toward Theaton's application in tandem with her protected activity uniquely affected Harvard's decision to deny tenure. With disputed facts and questions of credibility, Dr. Theaton's claims were prematurely dismissed at the summary judgment stage, and we ask that the decision below be reversed. First, the record reflects that Harvard held Theaton to a higher standard than the men in her department. Whether it be by books or projects, Theaton met the publication requirements for tenure. Harvard's own contemporaneous documents state as such. First, when the chair of Theaton's tenure committee emailed the chair of her department saying, Harvard doesn't require a completed second book, just a second project substantially underway, which we got here, referring to Professor Theaton. That email lists the last five people tenured in the anthropology department who only had one book. In fact, the professor recalls, now that I think about it, no successful internal candidate has had a second book. Theaton, at the time that she came up for tenure, had two books, both regarding her research in Peru, and also had made substantial progress on a second project with research in Colombia. Still, Harvard denied tenure, allegedly because of her publications. But when we look at the male candidates before and after her, she was held to a higher standard. One candidate in 2011... Yes, Your Honor, so Harvard asserts that they directed Theaton to publish in top-tier anthropological journals, which they did in a 2008 promotion letter. But the record reflects that they gave similar advice to the male comparators, and they too did not follow it. The goal was for Theaton to publish in the journals or whether through her books that expanded the reach of her publications, and that she did. And when you compare the substance of her research and publications, it matches or exceeds the comparators who are in the record here. And, for example, the one comparator in 2011 whose information is at the 3581 in the sealed joint appendix, had no single-authored books, only journal articles. His case statement actually states that the scholarly publications are comparatively few in number. Then after Theaton in 2014, another male comparator whose information is in the sealed joint appendix at 3849, only had a proposal and a sample chapter for his second book. And the reason here we're discussing books and projects is that Harvard's contemporaneous documents at the time were having a conversation about whether you needed one book or two books, or whether it was a question about having a substantial second project. And under either standard here, as applied when looking in comparison to the male candidates before and after Theaton, a jury could find that she met those qualifications. The record also reflects explicit comments about gender bias at Harvard and hostility towards Theaton's protected activity. The only tenured woman in Theaton's department who signed her promotion letter in 2008 that we just discussed warned Theaton that certain expectations would be placed on female faculty members that are not placed on male faculty members. This is the same professor that told her when she was first promoted in 2008 that in order to be successful, she needed to behave like a dutiful daughter, quote, dutiful daughter, and that that meant an employee who did not complain. The court below erred in dismissing the import of these comments simply because they were not made by the final decision maker, President Faust. This is where this court in Cordelia and Santiago Ramos has rejected such an analysis. No, no, no, that's too simple. What is the evidence that those comments actually influenced President Faust? Well, we can look at the comments that she would be held to a higher standard. We look at how she was treated in comparison to the competitors in the record. There are specific comments made by a woman in her department who assiduously supported her throughout her tenure track review. I'm asking what is the evidence that connects that woman's set of comments about standards as opposed to her recommendation of your client to President Faust? So the comments in the record, in addition to other evidence of gender discrimination, specifically in the anthropology department, connect to Faust through the decision. It adds color to the decision-making process where Faust herself was receiving the information from what happened in the ad hoc committee. She herself was making a decision based on the recommendation of others, not on her own independent view. And she considered the support of the department for your client, correct? She considered the department's support, which in part was why she had such a strong reaction to the recommendation of the ad hoc to deny tenure. She specifically said, in the moment, I'm bewildered and puzzled why I'm getting a recommendation to deny tenure when on paper it looks like she should be tenured. Yes, we're familiar with the record. You still haven't answered my question about how this particular professor's view of what it would take for a woman to achieve tenure in any way impacted or influenced the President's decision. It influenced the process that President Faust made her decision. Okay, so when you say it colored the process, is that all that you mean? It colored the process from step one to the ad hoc, which is what Faust made her decision. I'm a bit confused because she was talking about her department, but the department, in fact, recommended tenure for your client. Yes, in the initial stages, but the department chair of the ad hoc, while the department, yes, did vote for her, the chair of the department ultimately in the ad hoc did not. He was the first person to present. He set the tone of the ad hoc meeting, and his recommendation, as noted by three of Harvard's witnesses contemporaneously, was negative, and more negative so than what had been documented about his opinion prior to that part of the process. In addition, the comments that we talked about with respect to certain expectations and the dutiful daughter, these comments don't stand alone as the only evidence in the record of gender bias. In 2011, the Board of Governors at Harvard hired a visiting committee to look specifically at the anthropology department, Dr. Tiden's department, and they found the department lacked gender diversity and that it was an issue of great concern, and of such concern that junior female faculty members were leaving or considering leaving Harvard because of the issues. This evidence of a discriminatory atmosphere, not just at Harvard, but in the department where, in Dr. Tiden's department, serves as compelling evidence of the atmosphere of discrimination and adds color to that process by which the department chair and the head of her department were shepherding her application through this process. All right, so your position is that the department chair's decision not to recommend tenure so influenced the ad hoc committee of independent examiners? Yes, Your Honor. We know that the chair of the department's negative pivot uniquely affected President Faust's decision. He was the first person to present at the ad hoc, and as a result of that, Judith Singer, who was the vice provost of diversity at the time, she told President Faust after the fact that I rarely underscore, rarely take notes, but when this professor started testifying, self-presenting much more negatively than his letter before and his testimony before that, I started taking notes. Both Singer and Professor Garber, the only two people that spoke with President Faust after the ad hoc,  That doesn't exactly get to the question I'm trying to ask. It still was the ad hoc's recommendation that she be denied tenure? Yes. And those were outside independent examiners? Yes, in part. There were also internal members of the department who testified at the ad hoc, the first being the chair of her department, who witnesses note were increasingly negative, and a jury could find that that negative presentation, first out the gate, tainted the process and then thereby tainted the information that was given to President Faust. And I think that's particularly so here because... Pardon me, but, you know, one can give negative information because that's one's honest assessment of the work being analyzed. What is your evidence that this was not motivated by an objective view, or subjective for that matter, but by gender discrimination? The evidence that it was motivated both by gender discrimination and by a retaliatory animus is the temporal proximity between when the chair of the department first appeared to be supportive of Dr. Tiden's application and then took a negative pivot in sharp turn with respect to Dr. Tiden's application. And how does that support gender discrimination? This court has been clear that circumstantial evidence, including temporal proximity, deviations from ordinary procedure, comments of discriminatory or retaliatory animus, from that a jury may infer intentional discrimination and retaliation. And this witness in particular, the chair of the department, he voted first for Dr. Tiden on February 27th, 2013. On March 7th is the day that Dr. Tiden was outspoken in the Harvard Crimson, their newspaper, about supporting students' Title IX rights. And only three days later he wrote a private letter to the dean saying, I question whether she would contribute to the intellectual life of the department. And from there it's described by Harvard's witnesses that his presentation on April 10th at the Committee on Appointment and Promotions was more negative than his letter that came before. And then his testimony at the ad hoc on May 23rd, 2013, was more negative than what came before that. And the only intervening event in between April 10th and May 23rd is learning about Dr. Tiden's role helping students report sexual harassment in his own department. Excuse me. Yes. The Crimson, that's published daily, am I correct? I believe so, Your Honor. I think they update it online maybe more than daily, but it's frequently published, yes. Is there anything in the record as to the distribution in terms of, first of all, numbers? And to whom? No, Your Honor, but we do know that the chair of the department testified that I was aware that Kimberly was writing letters strongly in support of students who accused other students of sexual harassment, and also letters that criticized Harvard as an institution for not having the proper kind of procedures in place to support students who were victims of sexual harassment. And he testified that he knew Dr. Tiden was taking those actions, criticizing Harvard and supporting students who had accused other students of sexual harassment, at the same time that there were instances of sexual harassment in his own department, which coincides exactly with Dr. Tiden's tenure review. As I remember, you were alleging that that is protected activity? It's protected activity that first she helped students who then turned graduate students who became employees in the department report sexual harassment against another professor. That is Tiden's first protected activity. The second is commenting in the crimson in support of the students who were protesting Harvard's handling of their rights under Title IX. In addition to Tiden's own complaints about gender discrimination in the department, about the dutiful daughter comment that she reported first in 2010, but then came back in 2012 right before her tenure review when the tenure committee asked. We heard that there were reports from the past that had to do with humility in her department, what was going on, and they recirculated her complaints of gender discrimination back in 2012. Thank you. Thank you. Good morning, Mr. Murphy. Thank you, Your Honor. May it please the Court. My name is Martin Murphy and I represent Harvard in this matter. Respectfully, we request that the Court affirm the decision of the district court granting summary judgment in this case. Professor Tiden has failed to offer any evidence, direct or circumstantial, that would call into question the legitimate merits-based reasons that Harvard's ultimate decision maker, President Faust, advanced to deny Kimberly Tiden's application for tenure. Well, why didn't he express surprise then to begin with after the decision of the committee? You're speaking of the department chair, Your Honor? Faust. Faust. Well, I think, Your Honor, that she sent a series of e-mails to Provost Garber and to Vice Provost Singer, the vice provost for diversity, that shows that she conducted an independent searching inquiry of the record, the kind of inquiry that one would expect from an independent decision maker. She had received a report, on the one hand, from Provost Garber and from Vice Provost Singer, about what had happened at the ad hoc committee meeting. This committee of scholars convened to advise her. And she also looked at the record. And she saw a disconnect in the record between the assessment of the merits of Professor Tiden's candidacy internally and that externally. And that's ultimately the decision that she had to make. The record shows that she made that decision completely on the merits because under Harvard's system, it is often the case that external scholars will have a better perspective on a unique candidate's ability to contribute to a particular field than the people in her own department, who may not have the same specialty and may not have the same kind of knowledge base about whether a person is seen as a rising star in that area. Excuse me, but maybe I have not read the record correctly, but as I understand it, he gets a recommendation from the ad hoc committee. His initial response to that is bewilderment. Your Honor, it's President Drew Faust, a woman, who makes this decision. So if I could respectfully correct the court in that respect. That's what her statement is because she asks, what is the cause of the differences between the scholarly assessment of the people in her own department and the outside scholars who evaluate the candidacy? And that's an inquiry, I would respectfully suggest, that is precisely the kind of inquiry that the President should make. It shows that it's a merits-based inquiry. Ultimately, as Your Honor said in the Villanueva decision a number of years ago in the Wellesley College case, ultimately respect has to be accorded to the decision makers in these kinds of academic tenure cases. And unless the arguments that are made, the reasons that are given to support... That decision is long gone, but I don't recall anybody using the term bewilderment in that case. Well, what is required by that case, Your Honor, is that the reasons given by the university for denying tenure be obviously weak or implausible. And I would respectfully suggest that they are nothing like that here. The Harvard system is designed to make sure that Harvard's president, who is the ultimate decision maker, has the very best advice, not just from folks at Harvard, but from scholars in the community of anthropology generally, to ensure that its candidates are the very best available. The system is designed to make sure that there is a really rigid, searching inquiry of a candidate's qualifications. It understands human nature that a person's colleagues in one's own department may be reluctant to be critical of the individual, in that the best way to get an assessment about whether this person is a scholar of the first order of eminence is to ask the opinions of scholars from other universities. In this case, the scholars from other universities said uniformly when asked, is Kimberly Tyden seen as a rising star in anthropology? Is Kimberly Tyden seen as a person who is likely to be viewed as a rising star in the world of Latin American anthropology in particular? Aside from the outside scholars, what are we to make of the chair's change of heart as to her qualification? Because it's my understanding that this ad hoc committee isn't even always convened. The record shows, Your Honor, that it is typically convened. That's the language that Harvard uses in its promotional standards. And certainly some cases are seen as, when they get to the Committee of Appointments and Promotions, clear yeses. Those go directly to President Faust. She makes the ultimate decision, but the committee has concluded that the record is sufficient to enable her to make that decision. Some cases are rejected by the Committee on Appointments and Promotions. But typically, and that's the language in the record, typically an ad hoc committee is convened. And in this case, Your Honor, the ad hoc committee that was convened was convened to provide advice to President Faust about Professor Tyden's impact on the world of social anthropology and Latin American anthropology in particular. But the appellant is arguing that the department chair's change of heart because of the communications, the proximity, that that has to be the explanation for why there was a change of heart. What is your response to why he seemingly went from being an advocate to being a criticizer? I think, Your Honor, it's important to take a look at the details of his actions. He began expressing concerns about the candidacy as early as the fall of the previous year when he first read the Spanish and English language editions of Professor Tyden's book. He noted the overlap and expressed concern about whether they could be viewed and ultimately concluded that they could not be viewed as two distinct projects. Over the course of time, he was the person to whom the external letter writers sent their letters. And he received two letters that raised doubts about the qualifications of Professor Tyden. One questioned her foothold in anthropology. One suggested that a professor from another university who thought originally she should be tenured went and checked out the Spanish language book at her own library and concluded that she should not be tenured. So he had the benefit of input from other people. So two books, I mean, if you look at the comparatives and what Harvard has said itself, two books has not necessarily been a requirement for consideration. Is it the fact that she promoted herself as having published two books that it became under more scrutiny? I would respectfully say no, Your Honor. I think the question about whether the English language book and the Spanish language book were two books or not really was a question about whether they could be counted in what the record is undisputed is a requirement that there be two distinct substantial projects. The tenure review committee, the department, and the ad hoc committee all concluded that they really should be viewed, the two, the English language edition and the Spanish language edition, really should be viewed as a single project. Then the question is, did Professor Tyden make substantial progress on a second project? And the record shows that she did not. The record shows that she had published a number of articles about work that she did in Columbia, but only one of those articles had been published in the previous five years. And the record also shows that none of those had been published in major anthropological peer-reviewed journals of the kind that she was advised to publish. In addition, with respect to those articles, she was told in 2008, you need to have both articles published in one of the five major anthropological peer-reviewed journals and you need to have substantial progress on a distinct new manuscript of a book. That's what was required. That was required of the other candidates as well. And with the exception of a candidate whose primary work was in the area of film, visual studies, the other successful candidates in the department, the other successful male candidates, all had achieved that goal. A manuscript of a second project and the articles published in these major anthropological journals. In fact, Professor Tiden herself recognized the importance of that second distinct book, a manuscript. In 2011, she asked the department, including the individual who would ultimately become the chair, whose conduct we've been talking about today, can I have an extra year off? Because if I have an extra year off, I can write that additional book. I can get that manuscript done. And my chances of getting tenure go up 90 percent. My tenure ability go up 90 percent. The professor who later became the chairman, whose conduct the plaintiff now criticizes, supported that effort in 2011. And she went off and took a year off. The tenure clock was stopped. But at the end of the year, there was no book. So the concern, the legitimate concern of the ad hoc committee was on her scholarly productivity. And those two factors, I think the record is undisputed, were what drove the chairman of the department, his concerns about her impact on the field and her scholarly productivity, the ad hoc committee members' concern about her impact on the field and her scholarly productivity, and ultimately President Faust's decision, which she made after this very serious consideration and back and forth and trying to understand exactly what had happened in the ad hoc and to weigh that against the information that she had from the department and from other sources to make a considered decision based on the merits. Now, I think the court, perhaps other scholars, this is the nature of this business, could disagree about whether Professor Tiden should be tenured or not. But I would suggest to the court that the real question is whether the plaintiff has offered specific facts which connect the denial of tenure either to gender discrimination or to retaliation for protected conduct. You could phrase that differently, too. You could say that the real question is whether there are enough circumstantial evidence to get beyond a summary judgment decision rather than let a jury decide. That's correct, Your Honor. And I think one way to think about that is to look at the Burns case, which is a recent case by this court where there was circumstantial evidence that was – this court reversed a summary judgment decision, finding that there was sufficient circumstantial evidence to send the case back to the district court for trial. In that case, if you look at the facts of that case, it reinforces the difference between what the court found there, this court found there, and what we have here. There's a difference between circumstantial evidence and simply speculation and guesswork, which is really what we have here. In the Burns case, the question was whether the decision was motivated by gender discrimination. And the decision-maker never said, I don't want women promoted, the decision-maker never said anything directly that would count as direct evidence of animus toward women. But the decision-maker made a number of statements that, viewed in context, gave rise to an inference that would have permitted the jury to find it. The decision-maker in that case referred to the plaintiff, a woman, as she, in a way that was viewed by the people who heard it as derogatory in tone. But why was this inquiry about her early support of victims even part of the tenure process? It was not a part of the tenure process, Your Honor, and that's, I think, the critical thing. There is no evidence that it was a part of the tenure process at all. No member of the ad hoc had any knowledge of- Did the president? The president did not. There is no evidence that the president- I think it's important to kind of walk through the chronology here. In 2010, the plaintiff, Professor Tiden, brought concerns to the divisional dean about what she saw as gender bias in her department. After that, she was promoted. She received awards. There was no adverse action that was taken five years earlier. In the course of the tenure deliberations, someone, an administrator, who had heard that there was some complaint that Professor Tiden had made about the person, the professor who had been selected to be the chair of her tenure review committee, asked, in the interest of making sure that there were no conflicts, whether there were any concerns. Vice Provost Singer resurrected her notes from 2010 and sent them to two administrators for the purpose of evaluating whether the professor who chaired the tenure review committee, who, as Judge Lynch has pointed out, was an extremely strong supporter of Professor Tiden, should continue in that role. The decision was made that she should and could. That information never made it past those two administrators. And there's no evidence that any one of the outside scholars on the ad hoc, that Vice Provost- pardon me, that Provost Garber, or that President Faust, had any idea that Professor Tiden had made these complaints back in 2010. They were not part of the tenure review process. And there's no evidence that they played any role whatsoever. I would agree with you. I don't think anybody would disagree with you in the fact that speculation is not part of the issue we're discussing here. But I would like to go down the list of facts that don't seem to be speculation and ask you whether they would not constitute sufficient circumstantial evidence to go to a jury rather than- For instance, you have unanimous support of the tenure by her colleagues. That's not speculation, is it? Well, I would say, Your Honor, it's not speculation. There was one abstention. But Harvard's process, that's only the first step. That's a fact. That's a fact. Yes, it's not speculation. Professor Ayrton initially advocated for his plaintiff's application. Am I correct? In his role, he voted to send the application forward. The only- in his personal capacity- I was asking the question, he initially advocated in his favor. He, at the departmental level, that professor, voted in favor, which he described in his deposition testimony and in his private confidential letter to Dean Smith as voting to advance her candidacy to the next level. And his change of heart came after, in terms of temporal issues, it came after she engaged in this allegedly protected activity. Well- Am I right? In part, Your Honor, he wrote his letter to Dean Smith on March 10th. On March 7th, so three days earlier, Professor Tiden had, and to answer the court's question on Dreck, not her- there's nothing in the paper copy of the Crimson that reflected anything she said. She posted in the online comment section of the Harvard Crimson, and that professor testified under oath that he had- he never read the Crimson and did not read those comments. The other protected activity- That's a question of credibility, usually left to a jury. I would suggest, Your Honor, that there's simply no evidence to suggest that, other than calling him a liar, which is not a- the kind of credibility determination that we make in these cases, that the plaintiff has to elucidate specific facts that would call into question whether the decision was made on the merits or not. I will further inquire. Thank you, Your Honor. I guess you know where I was going, though. Thank you, Your Honor. I appreciate it. Thank you. Ms. Murphy? Lori. Lori Correa. I'm sorry. Thank you. I'm getting my name's mess up here. Cory, I'm sorry. Yes, thank you. I first want to address Brother Murphy's comment about this being speculation and guesswork. The change in hostility isn't something that Dr. Tiden made up. It was contemporaneously described by Harvard's witnesses at the time that they were making this decision in this case. It is not speculation or guesswork that they inserted her 2010 protected activity into the process. The email on the record says, Dr. Tiden is coming up for tenure. We heard she had complaints in her department. What were they about? Now, Harvard has an excuse that says they wanted to make sure that there were no concerns about what happened with the department so that she shepherded through the process in a fair manner, but a jury gets to decide whether there was an improper motive or whether they believe Harvard's justification. I took his point to be a different one and would ask you to respond. This inquiry was never brought to the attention of the ultimate decision maker, the president, nor was it brought to the attention of the ad hoc committee mostly composed of outside scholars. There's not evidence in the record that it was brought to the outside scholars, but the email was received by Provost Garber and Provost Singer, the two people who were giving President Faust information about Dr. Tiden's decision. Is there any evidence that President Faust herself was aware of this activity that you call protected activity? The record doesn't reflect that President Faust herself was aware of it. That's your cat's paw theory, right? Yes, Your Honor. That the department chair manipulated the process in such a way that it infected President Faust's decision. Yes, Your Honor, and this is how Tate works. He was the first person to testify at the ad hoc. He uniquely affected the two individuals who carried the information back to President Faust, and the record reflects that after the fact, he sought to conceal his role in that process from his department. If I may interrupt you, you made a big point earlier about comparator evidence. As I understood this record, it was never about two books. It was about two independent scholarly endeavors, and so let's drop the two books out of it. And so some of your comparators drop out, I believe, on that basis. What we have here is an ad hoc committee of outside scholars, for the most part. They predominate recommending against tenure to the president of the university. Do you have a male comparator who, in that position where the ad hoc committee makes a recommendation against tenure, and they are respected outside scholars, nonetheless, that individual got tenure? No, Your Honor, if I'm understanding your question correctly, the comparators in the record, the ones that are similar in their careers to Titan, Okay, you don't have a comparator at the ultimate decision-making stage. Now, all of the men who came up internally, like Dr. Titan, were granted tenure. No, no, no. Is there a record of Harvard going against the recommendation of an ad hoc committee and giving tenure to a male, the president deciding to give tenure to a male, despite the fact that the outside committee of expert scholars recommends against it? No, Your Honor, I understand. So the only comparators in the record, I believe only one actually went to an ad hoc in the first place, but based on what we know, the ad hoc did recommend tenure. But here, where we have temporal proximity, comments directly of gender bias and retaliatory animus, and we know that the person whose shift is documented in the record was the first person to speak at the ad hoc, a jury could find that he tainted the process, and what went back to President Faust was tainted. One could read her email exchanges, which my colleague Judge Turea has highlighted, as her being aware of the possibility of issues and not wanting to make the decision without obtaining other information, which is not a cat's paw scenario. Yes, Your Honor, I see my time has elapsed. May I answer your question? Yes, please do. The record reflects that when she saw the written record and heard the tenure of the ad hoc that she expressed bewilderment as we discussed, she was puzzled, and she sought the feedback from two individual witnesses. A jury may find that she was genuinely considering and making that decision, but the record also reflects that the individual who spoke first at that meeting, the voice that carried most prominently back to President Faust Okay, I understand. You're repeating the argument. Thank you. Thank you. Thank you.